UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

LARRY CALDWELL,

        Plaintiff,

    v.

ROSEVILLE JOINT UNION HIGH
SCHOOL DISTRICT; JAMES JOINER
and R. JAN PINNEY, in their
official capacities as members
of the Board of Education;
TONY MONETTI in his official
capacity as Assistant
Superintendent for Curriculum
and Instruction, DONALD
GENASCI in his official
capacity Deputy Superintendent
for Personnel and Chief
Compliance Officer; RONALD
SEVERSON in his official
capacity Principal of Granite
Bay High School; and Does 1
through 10.

        Defendants.
_____/

NO. CIV. S-05-0061 FCD JFM

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on plaintiff and defendants' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]   The court heard oral argument on the motions on December 1, 2006.   On December 4, 2006, plaintiff filed an ex parte application to file supplemental briefing and for the court to defer ruling on the cross-motions for summary judgment until the plaintiff had an opportunity to conduct limited discovery.   On December 19, 2006, the court granted plaintiff's application and allowed for limited discovery to be followed by supplemental briefing from the parties.   In June 2007, after a stipulation by the parties for an extension of time to conduct discovery and file their supplemental materials, the parties submitted their supplemental briefs and supporting evidence.

At the outset, the court clarifies what this case is about. This case arises out of plaintiff Larry Caldwell's ("Caldwell") allegations that defendants violated his constitutional rights by denying him access to various fora due to his actual or perceived Christian beliefs.   Specifically, plaintiff asserts that because of his actual or perceived Christian religious beliefs, he was denied participation in various meetings and processes through which he sought to have Roseville Joint Union High School District (the "District") adopt his Quality Science Education ("QSE") Policy.   Plaintiff's QSE Policy addresses how the theory of evolution should be taught in the District's biology classes.

---

[1]   Defendants also filed a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.   At oral argument, defendants withdrew their Rule 11 motion.

Despite numerous arguments by both parties regarding the content of plaintiff Larry Caldwell's proposals, this case is *not* about how biology, including discussions of evolutionary theory, can or should be taught in public schools.  More specifically, this case is *not* about whether a theory of intelligent design can or should be included in the science curriculum for schools in the District.  Rather, this case is about whether Larry Caldwell was denied access to speak in various fora or participate in certain processes because of his actual or perceived religious beliefs.  As such, the content of plaintiffs' proposals, which he sought to speak about and have evaluated by the school district, are of no relevance to the issues presented in this litigation.  Therefore, despite plaintiff and defendants' numerous attempts to address, support, or attack the content of plaintiff's proposals, the court does not consider the merits of that issue, which is not before it.

## BACKGROUND[2]

---

[2]    Unless otherwise noted, the facts herein are undisputed.  (See Pl.'s Resp. to Defs. Stmt. of Undisp. Facts, filed Nov. 15, 2006 ("DUF"); Defs.' Stmt. of Genuine Issues in Opp'n to Mot. for Summ. J., filed Nov. 15, 2006 ("SDF"); Pl.'s Resp. to Defs.' Supp. Stmt. of Undisp. Facts, filed June 22, 2007 ("SDUF"); Defs.' Supp. Stmt. of Genuine Issues in Opp'n to Mot. for Summ. J., filed June 22, 2007 ("SSDF").

Throughout both parties' statements of undisputed facts, opposing counsel asserts that facts are disputed, but do not provide responsive evidence which demonstrates a dispute of fact. Also rampant throughout both parties' statements of undisputed facts, as well as their declarations, are characterizations of the facts that, at best, can be described as a liberal interpretation of the underlying evidence.  Moreover, both parties "dispute" certain statements of fact because the other party has made legal arguments as *purported* "statements of fact." Further, both parties have included multiple facts within each
(continued...)

3

From June 3, 2003 through June 1, 2004, Larry Caldwell ("plaintiff") sought to introduce new material into the science program in the District. (Pl.s' Fourth Am. Compl. ("FAC"), filed Oct. 27, 2005, ¶ 14). The District is a public high school district, organized and operating under the laws of the State of California. (DUF ¶ 1). The Board of Trustees is the unit of authority over the District. (DUF ¶ 7). Teachers within the District teach Darwin's theory of evolution in biology classes. (FAC ¶ 14) Plaintiff sought to have the District adopt his proposed QSE Policy, which address how the theory of evolution should be taught. (SDF ¶ 7). Plaintiff asserts that the QSE Policy presents some of the scientific weaknesses of evolution along with the scientific strengths. (SDF ¶ 6).

In seeking to persuade public officials of the district to adopt the QSE Policy, plaintiff engaged in three distinct public processes. (FAC ¶ 16). Specifically, plaintiff alleges that he sought 1) to list the QSE Policy as an agenda item at school board meetings, 2) to participate in the curriculum instruction team, and 3) to participate in the district's "instructional materials challenge" procedure. (Id. ¶¶ 6, 10, 12). Plaintiff

---

[2](...continued)
enumerated fact, some of which are disputed and some of which are not. Because of the manner in which the parties have crafted their declarations as well as their statements of undisputed facts, the court looks to the underlying evidence cited by the parties to determine whether there is an actual disputed issue.

Both parties also object to various pieces of evidence that the opposing party presents in support of his motion. Much of the evidence that the parties object to is immaterial to the court's analysis of the summary judgment motions. To the extent that the evidence is relevant, the court finds that the parties' objections are without merit.

contends that in his attempts to utilize procedures to introduce his QSE Policy, defendants James Joiner, R. Jan Pinney, Tony Monetti, Steven Lawrence, Donald Genasci, and Ronald Severson, acting in their official capacities, violated his constitutional rights.

**A.   School Board Meetings**

Plaintiff sought to place items on the school board agenda and have the board vote on his proposed QSE policy.  (See id. ¶¶ 6-10).  At all times from July 2003 through the present, the District has had in force Board Bylaw 9365, which provides, in relevant part,

> The president of the Board of Trustees and the Superintendent shall prepare an agenda for each meeting of the Board.  Any board member may submit an item for the board agenda any time before the agenda is posted. Items submitted less than one week before the scheduled meeting date may be postponed to a later meeting. . . . Any member of the public may request that a matter within the jurisdiction of the Board be placed on the agenda of a regular meeting.  The request must be in writing and submitted to the Superintendent with supporting documents and information, if any, at least ten working days before the scheduled meeting date.

(Board Bylaw 9365, Pl.'s Ex. 113 [Docket #231]; SDF ¶ 1).  This is the only legally-adopted, operative bylaw relating to the public's right to place matters directly related to the District's business on the agenda of governing board meetings under California Education Code § 35145.5.  (SDF ¶ 3).  The Board allows members of the public to address the Board either before or during consideration of each agenda item, and members of the public may also address the Board on any matter not on the agenda, but within the subject matter jurisdiction of the Board. (DUF ¶ 13).  Individual speakers are provided up to five (5)

5

minutes to address the Board and discussion of each agenda item is limited to thirty (30) minutes, although with Board consent, the President may modify the times provided as deemed appropriate.  (DUF ¶ 14).  The policy proposal embodied in the QSE Policy is a "matter directly related to school district business" within the meaning of California Education Code § 35145.5.  (SDF ¶¶ 9, 11).

On August 5, 2003, plaintiff sent an e-mail to board member Kelly Lafferty ("Lafferty"), a member of the Board of Trustees, with his proposed QSE Policy as an attachment.  (DUF ¶ 12; Pl.'s Ex. 3 [Docket #91]).  In this e-mail plaintiff wrote, "I like the idea of putting the evolution policy on the agenda as an information item for the September meeting, and as an action item for the October meeting."  (Pl.'s Ex. 3 [Docket #91]).

The minutes of the next regular board meeting held on August 5, 2003, provides, under the bulleted heading "Comments from Board and Staff," "[a]fter discussion, direction was given to include in the agenda for the September 2 Board meeting, the discussion of the supplemental material process/policy for science, inviting the teachers to attend, and to provide the science teachers with supplemental materials for their review to be discussed at the September 16 Board meeting.  (Exhibit 2:25-29 to Decl. of Sherie J. Feder in Supp. of Defs.' Mot. for Summ. J. ("Feder Decl.") [Docket #211], filed Nov. 1, 2006; see DUF ¶ 51). The transcript of the August 5, 2003 Board Meeting reveal that at the end of the meeting, Lafferty brought up the issue of how the District dealt with supplemental materials and whether or not it was an option to have supplementary material.  (Ex. 10 to Feder

Decl. at 103-15 [Docket #220]).  At no point during this
discussion did Lafferty or anyone else mention placing
plaintiff's QSE Policy on the agenda.  (Id.)  A consensus was
reached that the first step was to discuss the process of looking
at supplemental materials and whether the Board would decide to
continue with the same policy or deviate from that policy.  (Id.
at 114-15).

By August 6, 2003, Superintendent Tony Monetti ("Monetti")
and/or his assistant, Sherie Feder ("Feder"), had a copy of
plaintiff's proposed QSE Policy.  (SSDF ¶ 14; Pl.'s Ex. 4 [Docket
#92]).  Feder noted in handwriting on the document "8/5/03 –
Submitted by Larry Caldwell to Kelly Lafferty for review."
(Pl.'s Ex. 4 [Docket # 92]).  However, defendant Monetti contends
that he did not receive a copy of the August 5 e-mail from
Caldwell to Lafferty or discuss it contents with either plaintiff
or Lafferty during the August 2003-June 2004 time-frame.  (Decl.
of Tony Monetti in Supp. of Defs.' Supp. Briefing ("Supp. Monetti
Decl."), filed June 22, 2007, ¶ 5 [Docket #339]).

On August 29, 2003, Lafferty forwarded an e-mail to "Board
Members" with a "Cc" to Monetti.  (Pl.'s Ex. 5 [Docket #93]).
Lafferty asked whether the agenda was "out and available."  (Id.)
She also wrote that she "had asked to have this discussion after
we had set the policy on evolution because it is putting the cart
before the horse to talk about supplemental materials, when we
haven't given direction on the issue."  Lafferty further wrote
that "[i]f the supplemental materials policy is still on the
agenda, I think it should be tabled until we discuss the
evolution policy."  (Id.)  Plaintiff characterizes this e-mail as

7

a complaint by Lafferty that the QSE Policy was not on the
agenda.  (SSDF ¶ 26).  Defendants dispute this characterization.
(Id.)

The agenda for the September 2, 2003 Board Meeting
contained, under the heading "Information Matters," an item
entitled "Science Supplemental Materials."  (Exhibit 2:37 to
Feder Decl. [Docket #211]).  The brief description of this item
was set forth as to "[p]rovide the Board with an overview of how
science teachers currently use supplemental materials and how
teachers deal with issues of alternative ideas and theories not
expressed in the textbook."  (Id.)  No item on the agenda for the
September 2 meeting specifically referenced plaintiff's QSE
Policy proposal.  (See id. at 2:35-39 [Docket #211]).

At the September 2 meeting, plaintiff addressed the Board
concerning his draft QSE Policy during the public comment portion
of the meeting, identified in the Board Minutes as "Audience to
Visitors."  (DUF ¶ 54).  Plaintiff was invited by the Board
President, defendant R. Jan Pinney, to read the entirety of his
QSE Policy.  (DUF ¶ 54).  Later, when the discussion came to the
agenda item entitled "Science Supplemental Materials," defendant
Steven Lawrence ("Lawrence"), Assistant Superintendent for
Curriculum and Instruction, made a presentation.  (DUF ¶ 58).
Defendant Lawrence provided an overview of how the District's
science teachers currently used supplemental materials, how they
met the challenge of covering material required by the California
State Standards, and how they dealt with issues of alternative
ideas and theories not expressed in the textbook.  (DUF ¶ 58).
Following the presentation, a lengthy public discussion ensued.

8

(DUF ¶ 59).   There were discussions of the QSE Policy and plaintiff's supplemental material by plaintiff, his science expert Cornelius G. Hunter, Ph.D. ("Hunter"), supporters of the QSE Policy, and opponents of the QSE Policy.  (DUF ¶ 59). Towards the end of the discussion, in relation to comments and questions regarding the process for adopting supplemental materials, it was stated that the Board was "going to turn it over to Mr. Lawrence with everybody's approval to figure out how to best deal with this one way or another either at the site or at the District level and report back sometime in the future." (DUF ¶ 63; Ex. 11:130 to Feder Decl. [Docket #225]). Subsequently, Caldwell engaged in conversations with Lawrence regarding a review process for Caldwell's supplemental materials by science teachers in the District.  (See DUF ¶¶ 70-81).

On December 20, 2003, Caldwell submitted an Administrative Complaint, by letter, to Monetti.  (DUF ¶ 107).  The basis of the complaint was that the Board's decision to adopt, implement, and authorize the purchase of the Holt biology textbook as the basic instructional material for biology classes in the District, without first making a determination that the textbook contains an accurate, objective, and current presentation of the subject matter was a violation of the law.[3]  (Id.)  Monetti requested

---

[3]    The Board had voted to adopt the Holt biology textbook on Second reading at the July 1, 2003 Board Meeting.  (Id.) During the July 1, 2003 Board Meeting, both Caldwell and his expert, Cornelius J. Hunter, Ph.D. ("Hunter"), addressed the Board before and during the public discussion preceding the Board's vote to adopt the Holt biology textbook.  (DUF ¶ 47). Caldwell had also addressed the Board during the public discussion of the proposed adoption of the Holt biology textbook
(continued...)

that the Chief Compliance Officer regarding administrative complaints, defendant Donald Genasci ("Genasci"), together with the District's General Counsel, Phillip Trujillo ("Trujillo"), assist in the investigation and response to the complaint. (DUF ¶ 108). On February 18, 2004, Caldwell submitted a Second Administrative Complaint to Monetti. The basis of the second complaint was the District's failure to place Caldwell's proposed QSE policy on the agenda for the school board meetings in September and October of 2003. (DUF ¶ 110; Pl.'s Ex. 61 at 5 [Docket # 152]). Caldwell's Complaint stated that he "had been under the mistaken impression" that items could only be placed on the agenda by Board members and that, "in line with this understanding," he approached three Board members about placing the proposed QSE Policy on the agenda. (DUF ¶ 113). Plaintiff's second complaint also requested corrective action in the form of placement of his proposed QSE Policy on the agenda for the first regular board meeting in April 2004. (Pl.'s Ex. 61 at 6 [Docket #152]). By e-mail dated March 10, 2004, plaintiff withdrew this demand for corrective action based upon "(1) the fact that the board's usual meeting is now the third Tuesday of every month; (2) the fact that April 6th falls during Spring Break; and (3) the fact that the District won't have taken formal action on the Class Complaint before April 6th." (Ex. 5 to Decl. of Tony Monetti ("Monetti Decl."), filed Nov. 1, 2006 [Docket #193])

///

---

[3](...continued)
during the June 3, 2003 Board Meeting. (DUF ¶ 42).

On February 25, 2004, Genasci, Trujillo, and Caldwell met to discuss the Administrative Complaints. (DUF ¶ 114). Trujillo received an e-mail from Caldwell the following morning, complimenting both Genasci and Trujillo "for the professional, respectful and deliberate way in which the investigation hearing was conducted." (DUF ¶ 114). On April 9, 2004, Genasci issued the District's Statement of Decision to Caldwell's Administrative Complaints. (DUF ¶ 115). The Statement of Decision reviewed the investigation into both of the complaints and identified four separate and distinct issues. (DUF ¶ 116). The District found that (1) the District did not violate the law in its adoption of the Holt biology textbook in July 2003; (2) the District did not violate state or federal laws by not adopting certain supplemental instructional materials relating to evolutionary theory; (3) the District did not violate the textbook challenge process set forth in Board Policy 6521; and (4) the District did not violate Education Code § 35145.5 by not placing Caldwell's proposed QSE Policy on the agenda of the September 2, 2003 meeting because the statute does not require the Board or the District to allow members to place specific draft Board Policies on the regular agenda as an action item and because Caldwell did not submit the required written request. (DUF ¶¶ 116-19).[4]

Subsequently, Caldwell delivered a letter to Monetti, dated April 13, 2004, requesting that this proposed QSE Policy be

---

[4]   The Board discussed the Statement of Decision in closed session during the April 20, 2004 Board Meeting. (DUF ¶ 128). The Board President reported that the District acted appropriately and supported the decision of the compliance officer. (Id.)

placed onto the Board's agenda for the May 18, 2004 meeting, with
a copy of the proposed policy as an exhibit to his letter.  (DUF
¶ 122).  On April 19, 2004, Caldwell sent an e-mail to Trujillo,
offering to dismiss his February 18, 2004 Administrative
Complaint if the District agreed in writing to put his proposed
QSE Policy on the agenda for the May 18, 2004 Board Meeting.
(DUF ¶ 127; SDF ¶ 45).  Trujillo forwarded this e-mail to
Monetti, and on April 20, 2004, Monetti sent an e-mail to
Caldwell, accepting his proposal.  (DUF ¶ 127).  Monetti's e-mail
also informed Caldwell that Board President Dean Forman
("Forman") could not attend the May 18 Board Meeting and
suggested to Caldwell that the proposed QSE Policy be placed as
an item on the May 4 Board Meeting agenda.  (DUF ¶ 127).  Later
that day, Caldwell informed Monetti that he was agreeable to
having the QSE Policy included on the agenda of the May 4, 2004
Board Meeting.  (SDF ¶ 47).

     On May 4, 2004, Caldwell presented his proposal at the Board
Meeting.  (Ex. 13 to Feder Decl. at 10-26 [Docket #232]).  This
presentation was followed by questions posed to and answered by
Caldwell, (Id. at 27-32 [Docket #232]), and then by comments from
the public.  (Id. at 33-103 [Docket #232]).  The minutes of the
May 4 Board Meeting reflect that a motion was made by Lafferty to
adopt Caldwell's proposed QSE policy, but the motion died for
lack of a second.  (Ex. 2 to Feder Decl. at 2-123 [Docket #212]).
Forman proposed a modification of the QSE policy, and Lafferty
moved to approve the modification.  (Id.)  However, the motion
was rescinded because the modified policy became an non-agendized
item.  (Id.)  The District's counsel advised the Board about the

12

possible risks of voting upon this revised policy because the
public did not have an open session to discuss it under the Brown
Act.[5]  (See Ex. 13 to Feder Decl. at 136:18-137:14 [Docket
#232]).  Direction was given to bring Forman's proposed policy as
an agenda item at the next meeting for public comment and further
consideration.  (Ex. 2 to Feder Decl. at 2-123 [Docket #212]).

By letter to Genasci dated May 7, 2004, Caldwell withdrew
the First Administrative Complaint regarding the District's
adoption of the Holt biology textbook.  (DUF ¶ 134).  On May 17,
2004, Monetti received a written request from Caldwell that
Forman's compromise version of the QSE Policy be placed onto the
Board's agenda for the June 1, 2004 Board Meeting.  (DUF ¶ 133).
On May 24, 2004, Monetti denied Caldwell's request, stating that
the District did not agree with Caldwell's position that he had
rights to place an action item on a board meeting agenda.  (Pl.'s
Ex. 99 [Docket #208]).  However, the letter also noted that an
agenda item relating to the subject matter referenced in
Caldwell's May 17 request was planned for the June 1 Board
Meeting.  (Id.)

The agenda for the June 1 Board Meeting includes the item
"Revised Proposed QSE Policy."  (Ex. 2 to Feder Decl. at 2-135
[Docket #212]).  The agenda also referenced that this policy was
being brought forward for further consideration "per Board
direction at the May 4, 2004 Board Meeting."  (Id.)  Forman began
the discussion regarding the revised QSE Policy and then heard
public comment about the subject, including comments from

---

[5]   Plaintiff characterizes this as a "bogus procedural
objection."  (See SDF ¶ 58).

Caldwell.  (Ex. 14 to Feder Decl. at 19-42 [Docket #236]).  The
minutes of the June 1 Board Meeting reflect that a motion was
made by Lafferty and seconded by Gary Kidder ("Kidder") to
approve the proposed policy as a Resolution.  (Ex. 2 to Feder
Decl. at 2-137 [Docket #212]).  A Roll Call Vote was taken, and
the Resolution to adopt the revised proposed QSE Policy failed 3-
2.  (Id.)

     Following the June 1, 2004 Board Meeting and to the present,
neither Caldwell nor any other person has submitted a written
request to Monetti that the QSE Policy be placed onto any further
agendas for any further Board Meetings.  (DUF ¶ 137).  Since the
June 1, 2004 Board Meeting, Caldwell has addressed the Board at
school board meetings and has been allowed to speak and engage in
public debate on those issues being discussed.  (DUF ¶ 139).

**B.   Instructional Materials Challenge**

     Additionally, plaintiff sought to challenge the use of the
Holt Biology Textbook in the district.  (FAC ¶ 38).  At all times
from July 2003 through the present, the District had in force
Board Policy 6521, which provides:

> 1.0   Challenges to books and materials used in the
>       instructional programs shall be handled according
>       to adopted procedures.
> 2.0   The Board or staff shall not be requested to honor
>       challenges made by anyone who is not a parent or
>       student . . . , a citizen of the district, a
>       member of the staff, or a public official having
>       jurisdiction within the district.

(SDF ¶ 112; Pl.'s Ex. 108 [Docket #224]).  The District's
administration implemented Board Policy 6521 by adopting Staff
Rule 6521, which has been in effect at all time from July 2003
through the present, and which provides the procedure by which a

14

parent may request reconsideration of the use of certain instruction materials (the "instructional materials challenge"). (SDF ¶ 113; Pl.'s Ex. 108 [Docket #224]).  The first step in this challenge process is for the parent to contact the teacher in an effort to resolve the issue informally ("Level 1").  (<u>Id.</u>)  If the issue cannot be resolved, the matter is to be referred to the principal, who shall have the parent complete the "Request for Reconsideration of Instructional Materials" form ("Level 2"). (<u>Id.</u>)  The principal will forward this form and other appropriate correspondence to the assistant superintendent, who sets up a review committee composed of the assistant superintendent, two teachers of the same department where the material is being used, two parents, the principal of the school involved, and one school board member ("Level 3").  (<u>Id.</u>)  The committee reviews the challenge and prepares a written report for the assistant superintendent who will make a final determination.  (<u>Id.</u>)  The assistant superintendent then reviews the case and makes a decision that is communicated in writing to the person initiating the request.  (<u>Id.</u>)  At all times from June 2003 through July 2006, defendant Lawrence has been the assistant superintendent responsible for administering instructional materials challenges pursuant to Staff Rule 6521.  (SDF ¶ 116).

On July 1, 2003, the Board adopted the Holt biology textbook.  (SDF ¶ 114).  On that same date, Caldwell submitted to the District a written assessment of the Holt biology textbook by Hunter, which discussed the inaccuracies in the textbook.  (SDF ¶ 115).  Based upon Hunter's written critique, Caldwell believed that the Holt biology textbook's presentation of Darwin's theory

of evolution was not "accurate or complete" as required by the
California Education Code, and he sought to correct the purported
shortcomings by adopting supplementary materials to be used in
conjunction with the Holt biology textbook. (SDF ¶ 117).

On September 10, 2003, Caldwell sent an e-mail to Lawrence,
stating that he was hoping to get some clarification on
procedural questions regarding supplementary instructional
materials. (SDF ¶ 118; Pl.'s Ex. 19 [Docket #106]). Caldwell
asked whether the District had a procedure for parents to review
the instructional materials used in each of the biology
classrooms. (Pl.'s Ex. 19 [Docket #106]). Caldwell also sent
Lawrence another e-mail that day, asking whether the staff had
conducted assessments of the Holt biology textbook, and if so,
what the results of those assessments were. (DUF ¶ 66, Pl.'s Ex.
20 [Docket #107]). On September 12, 2003,[6] Lawrence responded to
Caldwell's e-mails, outlining Board Policy 6511, governing the
selection and use of supplemental materials, and Board Policy
6521, the instructional materials challenge. (Pl.'s Ex. 21
[Docket #108]). Lawrence's e-mail also noted that

> it would seem that you are challenging the material
> district-wide instead of at a particular school site.
> If this is true, since Board Policy 6521 is set up to
> focus on concerns between a person and single teacher
> or department, I will need to review the policy with
> the other cabinet members to determine what appropriate
> next steps would be in this wider process.

---

[6]   Lawrence initially responded to plaintiff's e-mails on
September 11, 2003, to inform him that he had been in a series of
meetings, would be in a meeting the following morning, and would
try to provide a response to his questions by the next afternoon.
(DUF ¶ 67).

(Pl.'s Ex. 21 [Docket #108]).  On September 18, 2003, plaintiff
responded by e-mail to Lawrence, submitting some comments and
suggested changes in the District's policies regarding the role
of the public in the selection of supplementary instructional
materials.  (Pl.'s Ex. 121 at 1 [Docket #244]).  Caldwell stated
that he was disappointed that the District did not have a policy
that would allow him to have a constructive conversation with the
science teachers in the District.  (Pl.'s Ex. 121 at 1 [Docket
#244]).  He stated that he thought the procedure seemed "like a
fairly 'negative' and adversarial way for a parent and member of
the community to seek to have meaningful input into the selection
of instructional materials," and "[t]hat isn't the kind of
process [he] had in mind."  (Pl.'s Ex. 121 at 1 [Docket #244]).
Caldwell also stated that he would like to have a conversation
with Lawrence

>about some *interim procedure for myself* and other
>interested parents and member [sic] of the community to
>have a constructive and substantive discussion with the
>science departments about what instructional materials
>– including supplementary materials – are currently
>being used to teach evolutionary theory in our
>District's biology classes . . . .

(Pl.'s Ex. 121 at 3 [Docket #244]) (emphasis added).

On September 29, 2003, Lawrence set a date and time that
Caldwell and Hunter could meet with the District's science
teachers.  (DUF ¶ 72).  Plaintiff contends that it was his
understanding that this meeting would provide an opportunity for
him to present the first level of his instructional materials
challenge to the Holt biology book.  (DUF ¶ 71).  Caldwell
relayed to Lawrence that Hunter would prefer to have the meeting
on October 28 or October 29, 2003.  (DUF ¶ 72).  On October 8,

2003, Lawrence sent an e-mail to Caldwell stating that he was
tentatively planning to have the meeting on October 29, 2003, and
that he would confirm that date with Caldwell the next week.
(DUF ¶ 72; Ex. 6 to Decl. of Steven Lawrence ("Lawrence Decl."),
filed Nov. 1, 2006 [Docket #196]).

On October 29, 2003, a district-wide meeting of science
teachers was held at the District's headquarters.  (SDF ¶ 126).
The meeting was presided over by Lawrence and attended by over
twenty science teachers from high schools in the District.  (SDF
¶ 126).  The meeting was also attended by defendant Ronald
Severson ("Severson"), the principal of GBHS.  (SDF ¶ 126).
Caldwell and Hunter made a presentation of the proposed
supplemental materials for the teaching of evolution on a
District-wide basis.  Hunter made an oral presentation at the
meeting, supported by a PowerPoint presentation.  (SDF ¶ 127).
During and following the presentation, Hunter and Caldwell
answered questions from Lawrence, Severson, and many of the
science teachers in attendance.  (SDF ¶ 127).  Caldwell also made
an oral presentation at the meeting, supported by a PowerPoint
presentation and including a discussion of five short video
curriculum modules entitled "Icons of Evolution Video Curriculum
Modules."  (SDF ¶¶ 127-28).  At the end of the meeting, Lawrence
informed Caldwell that the District would be sending Hunter's
PowerPoint presentation and the video curriculum modules to
science professors at universities for review, so that the
science teachers could consider those reviews before making their
decision regarding plaintiff's supplemental materials.  (SDF ¶
131).  The following day, Caldwell sent an e-mail to Lawrence

thanking him for the meeting and attaching the written supplementary material Caldwell and Hunter had proposed.  (Ex. 7 to Lawrence Decl. [Docket #196]).

On November 7, 2003, Caldwell sent an e-mail to Lawrence, stating that his understanding of the current status of the additional instructional materials they submitted was that the District staff is in the process of obtaining an outside review of the materials.  (DUF ¶ 80; Ex. 13 to Lawrence Decl. [Docket #196]).  In response, Lawrence sent an e-mail to Caldwell, stating that he was conducting research to present to the teachers regarding the materials in an effort to help inform their decision.  (DUF ¶ 81; Ex. 13 to Lawrence Decl. [Docket #196]).  Caldwell responded by e-mail, stating that it was his intent "to have the additional materials Dr. Hunter and I have proposed as part of the District's 'basic instructional materials' for biology, based on our contention that the Holt textbook standing alone does not qualify as accurate, objective and current."  (DUF ¶ 84; Ex. 14 to Lawrence Decl. [Docket #196]).  Caldwell stated that he had become confused about whether the additional materials were being considered as basic instructional materials or supplemental instructional materials based on a misunderstanding about what procedure would be followed in making the ultimate decision on the materials.  (DUF ¶ 85; Ex. 14 to Lawrence Decl. [Docket #196]).  Caldwell also asked if he was correct in assuming that the ultimate decision on the proposed additional materials would be made at the Board level.  (DUF ¶ 85, Ex. 14 to Lawrence Decl. [Docket #196]).  On November 17, 2003, Lawrence sent an e-mail to Caldwell,

clarifying the procedure the biology teachers are engaged in. (DUF ¶ 86; Ex. 14 to Lawrence Decl. [Docket #196]).  He stated that the teachers were considering the materials and determining whether the materials would be used as part of the curriculum. (DUF ¶ 86; Ex. 14 to Lawrence Decl. [Docket #196]).  He also stated that the Board directed that this issue go through biology teachers to their site-design teams, and that these findings would be presented at the meetings in December or January.  (DUF ¶ 86; Ex. 14 to Lawrence Decl. [Docket #196]).

On December 15, 2003, the District's science teachers authored a memorandum to District leadership regarding their recommendation that Caldwell's supplemental materials not be adopted because of their view that the materials in the newly adopted Holt textbook are "accurate, objective, and current." (SDF ¶ 140; Pl.'s Ex. 43 [Docket #129]).  That same day, Lawrence reported to the Board on the process that he and the biology teachers had gone through to evaluate the proposed supplemental materials.  (DUF ¶ 87).  As part of the briefing he provided the Board with various documents detailing his efforts to have the supplemental materials reviewed.  (DUF ¶ 87).  These documents included the District's science teachers' one-page evaluation of the supplemental materials and their unanimous decision not to use the materials as well as various responses from university professors.  (DUF ¶ 87).  Lawrence also acknowledged that Caldwell had requested an opportunity to submit Hunter's responses to the outside reviews, but that the teachers had decided to make their decision without consideration of those responses.  (SDF ¶ 144; Pl.'s Ex. 44 at 2 [Docket #130]).

Finally, Lawrence stated that he believed the teachers' decision was sound and should be supported.  (Pl.'s Ex. 44 at 2 [Docket #130]).

On December 22, 2003, Caldwell called Lawrence to discuss the decision and its ramification.  (SDF ¶ 149).  Caldwell inquired as to the step in the process whereby the science teachers would report to their respective principals and the principals would in turn report to Lawrence.  (SDF ¶ 150).  Lawrence told Caldwell that this step had been rendered moot by the science teachers' unanimous decision on the matter.  (SDF ¶ 150).  On December 23, 2003, Caldwell sent an e-mail to Lawrence confirming their telephone conversation on December 22, 2003 regarding the status of his supplemental materials.  (DUF ¶ 88; Ex. 25 to Lawrence Decl. [Docket #198]).  Caldwell confirmed that the District's science teachers recommended not adopting the supplemental materials and that the District administration accepted this recommendation.  (DUF ¶ 88; Ex. 25 to Lawrence Decl. [Docket #198]).  Caldwell also confirmed that the District administration and staff do not plan to take any further action on this matter.  (DUF ¶ 88; Ex. 25 to Lawrence Decl. [Docket #198]).  Caldwell concluded by asking whether the District has a procedure for an appeal from, or request for reconsideration of, the District administration's decision.  (DUF ¶ 88; Ex. 25 to Lawrence Decl. [Docket #198]).  Lawrence responded to the e-mail on December 24, 2003, stating that he had previously sent Caldwell an e-mail reviewing the process that would be employed as well as providing plaintiff with the Board policies governing textbook selection, supplemental materials, and the challenge

process.  (SDF ¶ 152; Pl.'s Ex. 54 [Docket #141]).  Lawrence also stated that he reviewed what the process would be prior to the presentation to the science teachers.  (SDF ¶ 152; Pl.'s Ex. 54 [Docket #141]).  Lawrence stated that he believed that these materials provided Caldwell with all the information he needed. (SDF ¶ 152; Pl.'s Ex. 54 [Docket #141]).

In January and February 2004, Caldwell submitted additional materials for Lawrence to review.  (SDF ¶ 165).  Caldwell contends that these submissions put Lawrence on notice of Caldwell's desire for the District's decision on his supplemental materials to be reviewed.  (SDF ¶ 165).

On February 25, 2004, Caldwell filed his Second Administrative Complaint, alleging that the District violated Board Policy 6521 with respect to plaintiff's alleged instructional material challenge.  (See DUF ¶ 118).  In its Statement of Decision issued April 9, 2004, the District found that it did not violate Board Policy 6521 because Caldwell did not initiate and therefore the District did not use the 6521 process.  (DUF ¶ 118).  Subsequently, Caldwell sent an e-mail to Monetti, stating that he would utilize the District's Staff Rule 6521 to initiate an instructional materials challenge to each and every one of the District's biology teachers one-by-one.  (DUF ¶ 120).

## C.  Curriculum Instruction Team

Plaintiff also sought to express his views by participating in the Curriculum Instruction Team ("CIT") of his daughter and son's high school, Granite Bay High School ("GBHS").  (FAC ¶ 29). At all times from September 1, 2003, through the present, GBHS

has had a parent advisory council called the CIT that is open to attendance by all parents of students at GBHS. (SDF ¶ 189). The CIT is administered on behalf of the District by Severson, the principal of GBHS. (SDF ¶ 189). The CIT meets on the first Wednesday evening of each month during the school year. (SDF ¶ 189).

At some point between September 2 and September 22, 2003, the administration of GBHS sent a newsletter entitled "News From the Den" to Caldwell and other GBHS parents. (SDF ¶ 191). This newsletter included a column authored by Severson, which invited all GBHS parents to come to the CIT by stating, "How is evolution taught in our school? . . . If you have questions like these about curriculum and instruction issues at GBHS, the Curriculum and Instruction Team is the place for you." (SDF ¶ 191). On September 22, 2003, Caldwell sent an e-mail to Severson acknowledging that he had read the newsletter and asking if a CIT meeting would be the appropriate forum for discussion and adoption of his proposed policy on teaching evolution. (SDF ¶ 192). The e-mail also stated that Severson told him that he supported plaintiff's proposed evolution policy and that plaintiff assumed he could still count on Severson to support the policy. (Pl.'s Ex. 23 at 1 [Docket #110]). Finally, the e-mail concluded by stating that plaintiff would welcome the opportunity to talk to Severson about this at a convenient time. (Pl.'s Ex. 23 at 2 [Docket #110]). On September 23, 2003, Severson sent an e-mail in response, stating that he would prefer to meet with plaintiff on this issue and that plaintiff was incorrect in stating that Severson supported plaintiff's policy. (Pl.'s Ex.

24 [Docket #111]).   Severson went on to explain that at GBHS,
curriculum is developed by the teachers, although the parents
regularly offer input and suggestions, identify problems, and
help examine proposed solutions.   (Pl.'s Ex. 24 [Docket #111]).
Severson stated that he and Caldwell should talk about how to
proceed with Caldwell's policy change request.   (Pl.'s Ex. 24
[Docket #111]).   He believed that Caldwell was suggesting a
challenge to the existing science curriculum and that would be
best dealt with through the district challenge process.   (Pl.'s
Ex. 24 [Docket #111]).   Severson apologized for the confusion on
the issue and concluded the letter by stating that he hoped
things could be cleared up with a face to face meeting.   (Pl.'s
Ex. 24 [Docket #111]).   Caldwell's proposed QSE Policy was not
placed on the agenda of the CIT Meetings held in October and
November 2003.[7]   (SDF ¶ 197).

The agenda for the CIT Meeting held on December 3, 2003
included as the last agenda item for the meeting "6 Science
Curriculum Update-Ron Severson-10 minutes."  (DUF ¶ 90).
Caldwell understood this agenda item to refer to the District's
ongoing consideration of Caldwell's instructional materials
challenge to the Holt biology textbook and his proposed
supplemental materials.   (SDF ¶ 199).   Severson placed this item
on the agenda because he expected that the District's science
teachers would have reported their decision on whether to use
Caldwell's supplemental materials by that time.   (DUF ¶ 91).

---

[7]   Defendants contend that plaintiff never requested that
any item be placed on the CIT Agenda and was not a regular
attendee at the CIT meetings before December 2003.   (SDF ¶ 197).

Caldwell attended the meeting accompanied by approximately ten other parents and citizens who supported the proposed QSE Policy and supplemental materials. (SDF ¶ 199).  However, the teachers' response had not yet been made at the time of the December 3, 2003 CIT Meeting, and therefore, Severson did not believe there was anything to discuss. (DUF ¶ 91).  At the outset of the meeting, Severson announced that the report of the science teachers was not yet available and there would be nothing to discuss regarding agenda item 6. (DUF ¶ 91).  Severson also stated that when the report from the science teachers was available it would be put back on the agenda and discussed. (DUF ¶ 91).  Caldwell contends that the science item was taken off the agenda in order to prevent Caldwell and his supporters in attendance from discussing their viewpoint on how evolution should be taught in biology. (DUF ¶ 91).  After the science item was removed from the agenda, Caldwell asked if he could distribute materials he had brought outlining Hunter's concerns with the new biology textbook. (DUF ¶ 94).  Severson told Caldwell that he could leave materials on the table so that others in attendance who would be staying for the remainder of the meeting could pick them up on their way out. (DUF ¶ 94).

On the day after the December 2003 CIT Meeting, Caldwell sent an e-mail to Severson, in which he complained about Severson's conduct and statements during the meeting. (SDF ¶ 203).  Plaintiff also requested that Severson put an item relating to the teaching of evolution on an upcoming CIT meeting agenda. (Pl.'s Ex. 36 [Docket #122]).  Severson replied to the e-mail, stating that Lawrence had informed him in early November

that the science teachers position paper would be ready to take to the CIT at the December meeting, and the item was placed on the agenda at that time.  (Pl.'s Ex. 37 [Docket #123]).  The e-mail stated that the CIT does not develop curriculum for the district.  (Pl.'s Ex. 37 [Docket #123]).  Severson also noted that plaintiff had challenged the treatment of evolution in the current textbook used by the school and that science teachers attended a presentation by an outside consultant hired by Caldwell.  (Pl.'s Ex. 37 [Docket #123]).  Finally, Severson stated that when a decision is made regarding plaintiff's challenges, that decision would be shared through the newsletter and discussed at a CIT meeting.  (Pl.'s Ex. 37 [Docket #123]).  He also stated that it was not his goal to offend anyone at the CIT Meeting; rather he though that "it would be prudent and kind to inform folks of the situation before they invested the rest of their Wednesday evening on issues they were unconcerned with." (Pl.'s Ex. 37 [Docket #123]).

On December 10, 2003, Caldwell sent Severson an e-mail, *inter alia*, offering to meet with Severson to establish a more civil relationship in the new year.  Severson sent Caldwell an e-mail in response, stating that he would be glad to meet with him at an early breakfast meeting and offering to pay.  (DUF ¶ 101).

The December 2003 "News From the Den" newsletter, published by Severson, included the current status of the proposal by Caldwell to have the District consider the adoption of supplemental materials.  (DUF ¶ 102).  Severson also stated at the conclusion of the newsletter that anyone interested in this issue could pick up copies of Hunter's documents as well as

responses the District received from the science community
regarding review of the materials at the January 6 CIT Meeting or
from his office after the winter break.  (DUF ¶ 102).  Finally,
the article states that the science teachers' position statements
would be published in the January newsletter and that the
District's final position should be prepared to be discussed by
the February CIT Meeting.  (DUF ¶ 102).  The agenda for the
January 2004 CIT Meeting included an announcement from Severson
in which he repeats the same message provided in the December
2003 newsletter.  (DUF ¶ 103).  The announcement also noted that
a parent should contact the teacher if he or she has a specific
concern about this or any other issue with an individual teacher
and, if not satisfied, a parent should let Severson know.  (Ex.
10 to Decl. of Ronald Severson ("Severson Decl."), filed Nov. 1,
2006 [Docket #189]).  In the February 2004 "News From the Den"
newsletter, Severson published the District's science teachers'
summary response regarding the Holt biology textbook.  (Ex. 11 to
Severson Decl. [Docket #189]; see DUF ¶ 104[8]).  The teachers
recommended that the supplemental materials not be used to
augment the concepts in the textbook.  (DUF ¶ 104; Ex. 11 to
Severson Decl. [Docket #189]).  Aside from the complaints filed
in this litigation, following the announcement of the science
///
///

---

[8]    The undisputed statement of fact states that the
science teachers' summary response was published in the January
newsletter.  However, review of the underlying evidence
demonstrates that it was published in the February 2004
newsletter.

teachers' position and response, Caldwell never requested that his proposals be placed upon a CIT Meeting agenda.[9]  (DUF ¶ 105).

Severson has never put Caldwell's proposed QSE Policy on the agenda for public discussion at any CIT Meeting.  (SDF ¶ 205).  Aside from the complaints filed in this litigation, following the announcement of the science teachers' position and response, Caldwell never requested that his proposals be placed upon a CIT Meeting agenda.[10]  (DUF ¶ 105).

**D.   The Current Litigation**

On January 11, 2005, plaintiff filed a complaint against defendants.  Plaintiff's Fourth Amended Complaint, the operative pleading in this action filed on October 27, 2005, alleges violations of (1) his First Amendment right to Free Speech; (2) his First Amendment Free Exercise and Establishment Clause rights; (3) his right to Equal Protection; and (4) his right to procedural due process.  Plaintiff and defendants filed cross-motions for summary judgment in this action.  After review of the parties extensive briefing and evidence and based upon the arguments made at the hearing, for the reasons set forth herein, defendants' motion for summary judgment is GRANTED, and plaintiff's motion for summary judgment is DENIED.

---

[9]   Plaintiff disputes this fact, pointing to the e-mail he sent to Severson on December 4, 2003.  This does not dispute the fact that after the response by the science teachers was issued, Caldwell never again requested that the item be placed on the agenda of a CIT Meeting.

[10]   Plaintiff disputes this fact, pointing to the e-mail he sent to Severson on December 4, 2003.  This does not dispute the fact that after the response by the science teachers was issued, Caldwell never again requested that the item be placed on the agenda of a CIT Meeting.

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> at 324. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id.</u> at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

585-87 (1986); <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 288-289 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Id.</u> at 251-52.

     In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

     In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and

all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

Plaintiff brings various claims for violations of his constitutional rights under 42 U.S.C. § 1983.  To state a claim under § 1983, plaintiffs must plead that (1) defendants acted under color of law, and (2) defendants deprived plaintiff of rights secured by the Constitution or federal statutes.  Gibson v. U.S., 781 F.2d 1334, 1338 (9th Cir. 1986).  Plaintiff asserts that defendants deprived him of (1) his right to Free Speech guaranteed by the First Amendment; (2) his right to procedural due process guaranteed by the Fourteenth Amendment; (3) his right to be free from the government's establishment of religion

///
///
///
///

guaranteed by the First Amendment; and (4) his right to Equal

Protection guaranteed by the Fourteenth Amendment.[11]

**A.   Plaintiff's Free Speech Rights**

Plaintiff alleges that his First Amendment rights were
violated because defendants allegedly refused to allow him to
discuss his proposed QSE policies in various fora.[12]  The Supreme
Court has identified thee distinct types of fora: (1) traditional
public fora, "places which by long tradition or by government
fiat have been devoted to assembly and debate;" (2) designated
public fora, places generally open to the public for expressive
activity, "even if [the government] was not required to create
the forum in the first place;" and (3) nonpublic fora, "public
property which is not by tradition or designation a forum for
public communication."  Perry Education Assn. v. Perry Local
Educators' Assn., 460 U.S. 37, 45-46 (1983).  Under this
doctrine, the state's ability to regulate speech depends on the
nature of the forum.  See id. at 44 ("The existence of a right of
access to public property and the standard by which limitations

///

[11]   In his briefing and other submitted materials,
plaintiff makes reference to conduct which he considered to be
taken in retaliation for pursuing an administrative complaint or
for expressing his Constitutional rights.  Plaintiff does not
mention nor allege a claim for retaliation in his Fourth Amended
Complaint.  As such, the court does not consider plaintiff's off-
hand allusions to such conduct as a separate claim.

[12]   Plaintiff alleged in his complaint that defendants
violated his constitutional right to Free Speech through (1)
school board meetings and agendas; (2) CIT meetings; and (3)
Instructional Materials Challenge.  At oral argument, the court
noted, and plaintiff conceded, that the Instructional Materials
Challenge is a process, not a forum, and therefore, plaintiff's
claim regarding this issue is more appropriately analyzed under a
procedural due process inquiry, not a Free Speech Inquiry.

upon such a right must be evaluated differ depending on the character of the property at issue.").

### 1. School Board Meetings

Plaintiff contends that defendants violated his First Amendment Free Speech rights because they refused to place his proposed QSE policy on the agenda for nine months during the 2003-2004 school year. (FAC ¶¶ 17-28). Defendants argue and plaintiff admits that he discussed the QSE policy at various school board meetings and was eventually able to place the QSE policy on the agenda. (See id. ¶ 25). However, plaintiff alleges that he was unable to place the policy on the agenda for twelve meetings during the 2003-2004 school year because defendants intended to discriminate against him based on his religious beliefs and affiliations. (Id. ¶ 28).

The State of California has designated certain public property for use as public fora. Under the Brown Act and the California Education Code, the California Legislature has designated school board meetings as limited public fora, i.e. fora open to the public in general, but limited to comments related to the school board's subject matter. Cal. Gov. Code § 54954.3 (West 2005); Cal. Educ. Code § 35145.5 (West 2005); see Leventhal, 973 F. Supp at 957; Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. 719, 729 (C.D. Cal. 1996). "The public's right to speak at open school board meetings includes the right to place school matters on the agenda of those meetings." Leventhal, 973 F. Supp. at 962 n. 7 (citing Cal. Educ. Code §

///

///

35145.5).[13]  The government may impose content neutral
regulations on speech in limited public fora if they are
reasonable time, place, or manner restrictions.  See Perry, 460
U.S. at 46; see also Leventhal, 973 F. Supp. at 956.  The
government may only impose content based prohibitions if they are
"narrowly drawn to effectuate a compelling state interest."  Id.;
see also Leventhal, 973 F. Supp. at 957.

Defendants argue that plaintiff's proposed QSE policy was
not placed on the agenda of a board meeting because plaintiff
failed to submit a written request to Superintendent Monetti, as
required by Board Bylaw 9365.  Plaintiff does not argue that
Board Bylaw 9365 is not content neutral; rather, plaintiff
contends that he "reasonably complied" with the procedural
requirements of Board Bylaw 9365 in August 2003 and that
defendants were on constructive notice of his intent to place his
proposed QSE Policy on the agenda of a board meeting.  In support
of his assertion that he reasonably complied with the bylaw,
plaintiff cites to his e-mail to Lafferty on August 5, 2003,
wherein he stated that he liked the idea of putting the evolution
policy as an information item on the September board meeting
agenda and putting it on as an action item on the October board
meeting agenda.  However, plaintiff cites no evidence that this
e-mail was directed to Superintendent Monetti or was ever

---

[13]    Plaintiff cites no authority, and the court has found
none, for his contention that he has a right to have an item
placed on the agenda as an "action" item, an item for the board
to vote on.  For the reasons set forth herein, the court need not
reach this issue as there is not a triable issue of fact
regarding whether plaintiff's First Amendment Free Speech rights
were violated.

received by Superintendent Monetti.  Plaintiff presents evidence that after the August 5, 2003 Board Meeting, Monetti was in possession of the draft of his proposed QSE Policy, which had been attached to his e-mail to Lafferty.  However, the attachment did not include a request for an item to be placed on a board meeting agenda.

Plaintiff also contends that during the August 5, 2003 Board Meeting, Lafferty requested that Caldwell's QSE Policy be placed on the next board meeting's agenda.  The transcript of that meeting does not reflect this; rather the transcript reflects that there was discussion about the Board's policy regarding supplemental materials.  (Ex. 10 to Feder Decl. at 102:13-115:21 [Docket #220]).  Lafferty stated that they were waiting for the science teachers to get back to school to decide whether the District was supplementing its curriculum with anything.  (Id. at 103:16-17; 111:24-112:3).  By the end of the meeting, a consensus was reached that the first step was to discuss the District's current policy regarding supplemental materials as well as potential intelligent design materials.  (Id. at 114-15).  At no point during this discussion did Lafferty or anyone else mention placing plaintiff's QSE Policy on the agenda of a September meeting.  An item entitled "Science Supplemental Materials" was placed on the agenda and discussed at the September 2, 2003 Board Meeting.

Plaintiff further contends that in an e-mail sent on August 29, 2003, Lafferty "complained" that plaintiff's proposed QSE Policy was not on the agenda.  Plaintiff mischaracterizes this e-mail.  Lafferty wrote that the evolution policy should be

discussed before the issue of supplemental materials, and "[i]f the supplemental materials policy is still on the agenda, I think it should be tabled until we discuss the evolution policy." (Pl.'s Ex. 5 [Docket #93]).[14]  However, neither the discussion during the August 5 Board Meeting nor the August 29, 2003 e-mail from Lafferty demonstrate that *plaintiff* gave Superintendent Monetti a written request to have an item placed on the agenda of a school board meeting.[15]

Plaintiff contends that defendants were on constructive notice of his desire to have his proposed QSE Policy placed on the agenda of a school board meeting.  In support of this argument, plaintiff asserts that he met defendant Joiner for lunch on August 15, 2003, in which he discussed his proposed QSE Policy.  (SDF ¶ 71).  The parties dispute whether plaintiff orally requested that Joiner place the proposed QSE Policy on the agenda of a school board meeting.  However, whether or not such

---

[14]   Lafferty also wrote that she "had asked to have the policy brought up on the Sept. 16th meeting to allow teachers more time for the beginning of school."  (Pl.'s Ex. 5 [Docket #93]).  It is unclear what policy she is referring to as she refers to both Caldwell's evolution policy and the supplemental materials policy in her e-mail.  However, at the August 5 Board Meeting, one of the speakers (who is not identified in the transcript) stated that there was no reason why the Board couldn't have a second meeting in September to deal with the issue of supplemental materials in science courses.  (Ex. 10 to Feder Decl. at 110:17-111:10 [Docket #220]).  This was the only comment relating to a second meeting in September during this discussion.

[15]   The court also notes that plaintiff's contentions regarding Lafferty's requests raise standing issues.  To the extent plaintiff is asserting that Lafferty's requests to place an item on the school board agenda were ignored or denied, he has proffered no legal authority to support why he can allege a First Amendment claim based upon the denial of another individual's request.

an oral request was made, plaintiff has failed to provide any
evidence that he submitted a written request to the
Superintendent to have the proposed QSE Policy placed on the
agenda of a school board meeting in the fall of 2003.  Plaintiff
has also failed to proffer evidence that defendants were on
actual notice of his desire to have his proposed QSE Policy
placed as an action item on the school board agenda.  Moreover,
plaintiff has failed to cite any legal authority for his
contention that the court should read a constructive notice
exception into Board Bylaw 9365.[16]  Nor has plaintiff proffered
any plausible excuse for why he failed to comply with the written
notice requirement.  Rather, plaintiff stated at oral argument
that he didn't submit written notice to the Superintendent
because he was not aware of the Board Bylaw.  Plaintiff's
ignorance of the Board's procedural requirements is not an excuse
for non-compliance, nor can it form the basis for holding
defendants liable of a First Amendment violation.

Finally, plaintiff contends that defendants' adherence to
the written notice requirement of Board Bylaw 9365 was merely a
pretext for viewpoint discrimination.  Plaintiff asserts that
during the September 2 Board Meeting, defendant Pinney stated
that the proposed QSE Policy was left off the agenda "on

---

[16]   Plaintiff's own arguments underscore the need for
compliance with the written notice requirement set forth in Board
Bylaw 9365.  Plaintiff contends that the Board should not have
discretion to "re-write a citizen's agenda item" or to decide
whether the agenda item should be designated as an information
item or an action item.  (Pl.'s Reply [Docket # 288], filed Nov.
22, 2006, at 9).  Under plaintiff's theory, written notice of
plaintiff's requested agenda item would provide much needed
clarity with respect to both the phrasing/content of the
requested agenda item as well as its designation.

purpose." (Ex. 11 to Feder Decl. at 18:6-10 [Docket #225]).
Plaintiff contends that this comment demonstrates that his policy
was not placed on the agenda due to viewpoint discrimination.
The court declines to construe defendant Pinney's comment so
broadly.  The undisputed evidence demonstrates that defendant
Pinney told plaintiff that it would be fine if he read the
proposed QSE Policy during the Audience to Visitors portion of
the meeting and that it would set the stage for later discussion
at that meeting.  (Id. at 15:15-16:7).  Plaintiff then read his
proposal and discussed his reasons for bringing the proposal to
the Board's attention.  (Id. at 16:17-18:9).  Later in that
meeting, under the agenda item entitled "Supplemental Science
Materials," which was an information item, not an action item,
there was extensive discussion about plaintiff's proposed QSE
Policy and his proposed supplementary materials.  Hunter spoke
during this time regarding his analysis of the textbook and
recommendation of the use of supplemental materials.  (Id. at
82:16-87:17).  Following Hunter's comments, plaintiff spoke again
about how the District was teaching evolution and about the
supplemental materials he suggested.  (Id. at 88:6-96:21).  In
light of this undisputed evidence that plaintiff was allowed
numerous opportunities to express his viewpoint at the September
2, 2003 Board Meeting, the court cannot find that defendant
Pinney's comment is evidence that the enforcement of Board Bylaw
9365 was pretext for viewpoint discrimination.

     Moreover, the undisputed evidence demonstrates that
plaintiff first submitted a written request to defendant Monetti
on April 13, 2004, seeking to have his proposed QSE Policy placed

as an action item on the agenda of the May 18, 2004 school board meeting.[17]   Subsequently, after his acquiescence to a change in date due to the expected absence of Forman from the May 18, 2004 Board Meeting, plaintiff's proposed QSE Policy was placed as an action item on the May 4, 2004 Board Meeting agenda.   Lafferty moved to adopt plaintiff's proposed QSE Policy, but the motion died for lack of a second.   Forman moved to modify the policy. However, the motion to adopt the revised policy was withdrawn due to concerns about compliance with the Brown Act.[18]   The revised proposed QSE policy was then placed as an action item on the June 1, 2004 Board Meeting agenda.   The revised policy was not adopted by the Board.

   Plaintiff also asserts that defendant Monetti's denied his request to put Forman's revised version of the QSE Policy as an action item on the agenda for the June 1, 2004 Board Meeting. Plaintiff argues that this is evidence of pretext.   Defendant Monetti denied plaintiff's request by letter dated May 24, 2004.

---

   [17]   Caldwell asserts that he submitted written notice of his request for an agenda item through his administrative complaint.   His letter dated February 18, 2004, requested "that the Board take corrective action to cure these statutory violations by agreeing to place my proposed QSE Policy on the agenda for the first regular board meeting in April of 2004, which I understand to be held on Tuesday, April 6, 2004 at 7:00 p.m." (Pl.'s Ex. 61 at 6 [Docket #152]).   By e-mail dated March 10, 2004, plaintiff withdrew this demand based. (Ex. 5 Monetti Decl. [Docket #193]).

   [18]   Plaintiff characterizes this as a bogus procedural objection that further evidences defendant Monetti's viewpoint discrimination.   The court rejects plaintiff's characterization. District's counsel raised a potential Brown Act concern relating to adequate opportunity for the public to comment on a revised proposal.   It is ironic that plaintiff minimizes the opportunity for public comment upon an issue when he has litigated this lawsuit on the very same basis.

(Pl.'s Ex. 99 [Docket #208]).  In the letter, Monetti stated that the District did not agree with plaintiff's position that he had a right under the Education Code to place an action item on a board meeting agenda.  (Id.)  However, defendant Monetti also stated that an agenda item was being planned for the June 1, 2004 meeting that encompassed the subject matter requested by plaintiff and that he would present the Board with plaintiff's request as additional information when the item is addressed. The June 1, 2004 Board Meeting included Forman's revised version of the QSE Policy as an action item, and the policy was voted upon at that meeting.[19]

    In support of his argument of pretext, plaintiff cites to a decision of the United States District Court for the Southern District of New York, National Council of Arab Americans & Act Now to Stop War & End Racism Coalition v. City of New York, 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007), where the district court

---

[19]    Plaintiff further contends that defendants' Answer to the Fourth Amended Complaint ("Answer") demonstrates an anti-Christian motive for their conduct.  Plaintiff again mischaracterizes the evidence in this case.  Defendants alleged that plaintiff was able to advocate his proposed QSE Policy to the District.  (Answer, filed Dec. 1, 2005, ¶ 14).  Defendants further alleged that the QSE Policy is based on a religious viewpoint and that plaintiff has no right to impose that viewpoint on the District.  (Id. ¶¶ 14, 41).  As stated by the court at the outset of this order, the court is not adjudicating whether plaintiff's proposed policy is secular or religious or whether it could lawfully have been adopted by the District. Defendants may or may not be justified in their allegations about the content of plaintiff's QSE policy.  However, the only relevant inquiry before the court is whether plaintiff was allowed to express his viewpoint.  As set forth above, based upon the undisputed evidence in this case, there is no triable issue of fact that plaintiff's First Amendment Free Speech rights were abridged due to his actual or perceived viewpoint.  The fact that defendants believed that plaintiff's viewpoint was religious is of no moment.

found that based upon all the record evidence, there existed disputed issues of material fact regarding whether the City's purported reasons for denying plaintiffs' permit application were pretextual.  This case is distinguishable from the facts and evidence presented in plaintiff's claims.  In <u>National Council</u>, defendants allegedly denied plaintiffs' permit to hold a rally on the Great Lawn in Central Park on the basis that plaintiffs' permit application did not have a rain contingency plan and did not have an acceptable load-in plan to control the size of the event.  <u>Id.</u> at 490-91.  However, plaintiffs proffered evidence that not all permitted Great Lawn events had a rain contingency plan.  <u>Id.</u> at 491.  Plaintiffs also presented evidence that they could have complied with the rain contingency requirement by using whatever measures other permittees used to publicize an event's cancellation.  <u>Id.</u> at 492.  The record evidence also demonstrated that although defendants had argued that a load-in plan was necessary because plaintiffs' event was not ticketed, most Great Lawn events were also not ticketed.  <u>Id.</u> at 493.  Finally, plaintiffs proffered evidence tending to show that rallies were categorically disfavored by defendants and that permits were granted to preferred speakers based in part on the speakers' financial contributions.  <u>Id.</u> at 493.

     Plaintiff Caldwell fails to proffer any evidence of this type.  Plaintiff did not present evidence that other members of the public who did not comply with the written notice requirement of Board Bylaw 9365 were allowed to place items on the agenda. Plaintiff also did not present evidence that he attempted to cure the defect in his notice until April 13, 2004.  Finally,

41

plaintiff did not present evidence that other citizens were given favorable treatment by defendants.  Rather, as set forth above, the evidence demonstrates that despite plaintiff's failure to comply with Board Bylaw 9365, he was given the opportunity to read his proposed QSE Policy and have it discussed by the public and the Board at the September 2, 2003 Board Meeting.  The evidence also demonstrates that once plaintiff complied with the requirements of Board Bylaw 9365, his QSE Policy was placed on the agenda of the May 4, 2004 Board Meeting as an action item.  Further, a revised version of this QSE Policy was then placed on the June 1, 2004 Board Meeting and voted upon by the Board.  As such, unlike the evidence proffered by the plaintiffs in National Council, plaintiff's evidence does not raise a disputed issue of fact regarding pretext.[20]

The court's review of the evidence submitted by the parties in this case reveals that there is not a triable issue of fact regarding plaintiff's claim that defendants violated his First Amendment rights by failing to place his proposed QSE Policy on the agenda of a school board meeting.  Plaintiff failed to comply with the content neutral requirements for placing an item on the agenda set forth in Board Bylaw 9365 until April 2004.  The undisputed evidence shows that when plaintiff followed the

---

[20]   In support of his argument of pretext, plaintiff also cites to the Tenth Circuit's decision in Axson-Flynn v. Johnson, 356 F.3d 1277 (10th Cir. 2004).  This case is inapplicable.  In Johnson, the Tenth Circuit found that there was a triable issue of fact regarding whether defendant had a legitimate pedagogical interest in requiring plaintiff to adhere to script she found offensive to her religion or whether defendant required such adherence because of religious animosity.  However, unlike in this case, there was no time, place, or manner restriction at issue in Johnson.

1  requirements of Board Bylaw 9365, his items were placed on the

2  agenda in a timely fashion.  Ultimately, the QSE Policy was

3  placed on the agenda as an action item at two board meetings in

4  2004.  Moreover, even when plaintiff failed to comply with Board

5  Bylaw 9365, he was permitted to discuss his proposed QSE Policy

6  and other related items during the "Audience to Visitors" portion

7  of board meetings as well as in the context of other agendized

8  items.  As such, plaintiff's motion for summary judgment

9  regarding his claim for a First Amendment violation arising out

10  of defendants' conduct relating to school board meetings is

11  DENIED, and defendants' motion for summary judgment is GRANTED.

12  **2.  Curriculum Instruction Team Meetings**

13      Plaintiff contends that defendants violated his First

14  Amendment Free Speech rights because defendant Severson refused

15  to allow plaintiff to discuss the proposed QSE Policy or the QSE

16  Instructional Materials at a GBHS CIT meeting during the 2003-

17  2004 school year.  (FAC ¶¶ 17-28).  Defendants contend that

18  plaintiff never requested that any item be placed on a CIT

19  agenda.  Defendants also contend that the Science Curriculum

20  Update was taken off the agenda of the December 3, 2003 CIT

21  Meeting because the science teachers had not yet rendered a

22  decision with respect to the supplemental science materials

23  proposed by plaintiff.

24      Both plaintiff and defendants fail to discuss the type of

25  forum implicated by CIT meetings.  A traditional public forum is

26  a place, which "by long tradition or by government fiat have been

27  devoted to assembly and debate."  Cornelius v. NAACP Legal

28  Defense & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) (quoting

Perry Educ. Ass'n, 460 U.S. at 45).  "When the government
intentionally opens a nontraditional forum for public discourse
it creates a designated public forum."  Diloreto v. Downey
Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 964 (9th Cir.
1999).  "All remaining public property is classified as nonpublic
fora."  Id. at 965.  The Ninth Circuit has recognized that
"[g]enerally, 'school facilities may be deemed to be public
forums only if school authorities by policy or by practice opened
those facilities for indiscriminate use by the general public.'"
Id. (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267
(1988)).  Where the forum at issue is a school facility, courts
must "focus on unique attributes of the school environment and
recognize broadly articulated purposes for which high school
facilities may properly be reserved."  Planned Parenthood of S.
Nevada, Inc. v. Clark, 941 F.2d 817, 825 (9th Cir. 1991) (citing
Hazelwood, 484 U.S. at 270-73)).  The inquiry is focused on the
school's intent.  Id. at 826.

     In this case, the undisputed evidence demonstrates that the
CIT is a parent advisory group that meets on a monthly basis at
each school site.  The CIT helps site principals gather parent
feed back on issues that concern them and their students.  The
intent of the school in opening the forum was to gather advisory
information from parents on relevant issues relating to the
school site, not to create a forum for unlimited public
expression by the general public.  As such, based upon the
undisputed evidence submitted by the parties, the CIT meetings
are a nonpublic forum open for a limited purpose.  See Diloreto,
196 F.3d at 967.  Accordingly, defendants' conduct "need only be

reasonable in light of the purpose served by the forum and viewpoint neutral to be permissible." <u>Id.</u> (citing <u>Rosenberger v. Rector & Visitors of the Univ. of Virginia</u>, 515 U.S. 819, 829; <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch.</u>, 508 U.S. 384, 392-93)).  "[R]estrictions on access 'can be based on subject matter . . . so long as the distinctions drawn are reasonable in light of the purpose served by the forum' and all surrounding circumstances." <u>Id.</u> (quoting <u>Cornelius</u>, 473 U.S. at 806, 809).

Defendants contend that Caldwell never requested that his item be placed on the agenda of a CIT meeting prior to December 2003.  Plaintiff argues that his e-mail sent September 22, 2003, included a request that his proposed QSE Policy be placed on the agenda of a CIT meeting.  The court has reviewed this e-mail and finds that it does not contain such a request.  Rather, plaintiff's e-mail asked defendant Severson whether the CIT would be the appropriate forum for discussion and adoption of his proposed policy.  Defendant Severson's response stated that curriculum at GBHS is developed by the teachers and that because he believed plaintiff was suggesting a challenge to the existing science curriculum, that would be best dealt with through the district challenge process.  Plaintiff has proffered no evidence that he requested that any item be placed on an agenda prior to December 2003.

Defendants also contend that Severson removed the Science Curriculum Update item from the December 3, 2003 meeting for

///

///

///

content neutral reasons.[21]   Specifically, defendants assert that

Severson expected to discuss the District's science teachers'

response to plaintiff's proposed supplemental materials but that

the teachers' response had not yet been made at the time of the

CIT meeting.   Defendants' proffered reason for removing the

Science Curriculum Update from the agenda was viewpoint neutral

and reasonable in light of the purposes served by the forum.

Plaintiff contends that this reason was merely a pretext for

excluding plaintiff's expression based upon his viewpoint.[22]

However, plaintiff's proffered evidence of pretext consists of

inadmissible evidence.   Plaintiff asserts that Deputy Strickland

told Forman that, at a cabinet meeting, Severson said he was not

going to permit Caldwell to bring his QSE Policy before the CIT.

(Decl. of Dean I. Forman in Supp. of Pl.'s Opp'n ("Forman

Decl."), filed Nov. 15, 2006, ¶ 10 [Docket #276]).   This is rank

hearsay, and the court cannot consider it.   Forman also declares

that he believed that "CIT is not really a forum for parents to

change things but for Ron to keep their input out." (Id. ¶ 11).

Forman lays no foundation for this cryptic opinion.   See Fed. R.

_____

[21]   Notably, the item was placed on the agenda by defendant
Severson, not by plaintiff.

[22]   Citing Santa Barbara School District v. Superior Court,
13 Cal.3d 315, 335 (1975), plaintiff also argues that defendants
violated Education Code § 966 by changing its posted agenda
within the 48-hour period immediately preceding a regular
meeting.   This case is inapplicable to the agenda of CIT meetings
as it involved the agenda of a school board meeting, not the
meeting of a parent advisory group.   Moreover, section 966 was
formerly a section of the Education Code pertaining to the
governing board of any school district.   See Smith v. Bd. of
Supervisors, 216 Cal. App. 3d 862, 873 (1989).   Not only is the
CIT not a governing board, but plaintiff has also failed to cite
the current, relevant portion of the Education Code that embodies
this principle.

Evidence 602 (West 2007).  As such, it is also inadmissible.[23]

Moreover, the undisputed evidence demonstrates that although the

Science Curriculum Update was taken off the agenda of the

December 3, 2003 CIT Meeting, plaintiff was permitted to leave

materials on the table so that others in attendance who would be

staying for the remainder of the meeting could pick them up on

their way out.  Further, in the December 2003 "News From the Den"

newsletter and in the agenda for the January 2004 CIT Meeting,

defendant Severson stated that anyone interested in the

supplemental science materials issue could pick up copies of

Hunter's documents as well as responses the District received

from members of the science community at his office.

Plaintiff also contends that after the agenda item was

removed, he requested via e-mail that an item relating to the

teaching of evolution be placed on the agenda of an upcoming CIT

meeting.  Defendant Severson responded to plaintiff's request by

stating that when the teachers had rendered their decision on the

supplemental materials, it would be posted on the web, in the

newsletter, and discussed at a CIT meeting.  When the science

teachers recommended that the suggested supplemental materials

not be used to augment the textbook, their response was reprinted

in the February 2004 "News From the Den" newsletter.  After this

announcement, there is no evidence that plaintiff or anyone else

///

---

[23]     Furthermore, plaintiff proffers no evidence that certain viewpoints relating to the teaching of evolution were allowed to speak while anyone espousing his views were restricted.  Rather, the undisputed evidence reveals that the Science Update was not open for discussion at the December 2003 CIT Meeting.

1  requested that the teaching of evolution be placed on a CIT

2  agenda.

3      In sum, plaintiff fails to proffer any evidence that an

4  agenda item was not included for a CIT meeting because of

5  defendants' attempt to suppress a particular viewpoint.  The

6  undisputed evidence demonstrates that defendant Severson removed

7  the agenda item relating to the science curriculum because he did

8  not have relevant information from the science teachers.

9  Defendant Severson also allowed plaintiff to leave his materials

10 for others at the meeting to pick up.  The undisputed evidence

11 also demonstrates that after the science teachers rendered their

12 decision, neither Caldwell nor anyone else requested that

13 Severson place an item relating to the teaching of evolution on

14 the agenda of a CIT Meeting.[24]  The evidence does reflect that

15 defendant Severson did not agree with plaintiff's QSE policy.

16 However, mere disagreement, without more, is insufficient

17 evidence of pretext to raise a genuine of issue of material fact.

18 To hold otherwise would restrain public officials from expressing

19 their own viewpoint for fear of litigation, and the court

20 declines to adopt such a precedent.  Therefore, plaintiff's

21 motion for summary judgment regarding his claim for a First

22 Amendment violation arising out of defendants' conduct relating

23 to CIT meetings is DENIED, and defendants' motion for summary

24 judgment is GRANTED.

25 ///

26

27     [24]    Plaintiff appears to argue that requested relief in
   this lawsuit constitutes such a request to place an item on a CIT
28 meeting agendaa.  The court disagrees.

48

**B.   Plaintiff's Procedural Due Process Rights**

Plaintiff further alleges that defendants have subjected him to a deprivation of his rights to procedural due process under the Fourteenth Amendment.  Specifically, plaintiff alleges that defendants have violated his procedural due process rights because they have deprived him of his Free Speech rights by means of unconstitutionally vague unwritten policies and practices. (Pl.'s Mot. for Summ. J., filed Nov. 1, 2006, at 22).

**1.   Instructional Materials Challenge**

Plaintiff contends that, in violation of his rights to procedural due process, defendants deprived him of his second through fifth level of review in the Instructional Materials Challenge, undertaken pursuant to Board Policy 6521 and implemented pursuant to Staff Rule 6521, on the basis of unlawful viewpoint discrimination.  Defendants contend that plaintiff was given preferential treatment and had access to unprecedented and unique procedures instituted to fulfill plaintiff's request. Defendants further contend that the unique process granted to plaintiff fell well outside the procedures outlined by Staff Rule 6521, and thus, plaintiff was not entitled to those levels of review.

To establish a procedural due process claim on the basis of a vague regulation, a plaintiff must present evidence of the deprivation of a constitutional interest, and second, demonstrate that the deprivation was achieved by means of unconstitutionally vague policy or procedure.  Williams v. Vidmar, 367 F. Supp. 2d 1265, 1274 (N.D. Cal. 2005) (citing Zinermon v. Burch, 494 U.S. 113, 125 (1990)).  Plaintiff contends that he was deprived the

requisite levels of review he was entitled pursuant to Staff Rule 6521.  Plaintiff further contends that this deprivation was achieved through defendants' unwritten policy of discriminating against individuals based upon their viewpoint.

The undisputed evidence demonstrates that plaintiff was not entitled to the levels of review set forth in Staff Rule 6521 because he had not invoked an instructional materials challenge. On September 10, 2003, plaintiff inquired of defendant Lawrence what the procedure was for parents to review instructional materials used in each of the biology classroom.  Defendant Lawrence responded by outlining Board Policies 6511 and 6521, but stated that Board Policy 6521 is set up to focus on concerns between a person and a single teacher and, thus, may not provide the process for the type of challenge plaintiff was requesting. Plaintiff responded with an e-mail stating that he was disappointed with the lack of a District policy that would allow him to engage in a District wide process.  Plaintiff's response also provided that he would like to have a conversation with defendant Lawrence about an *interim procedure* for himself and other interested parents in the community to discuss instructional materials with the science department. Subsequently, on October 29, 2003, plaintiff and his expert made a presentation of plaintiff's proposed supplemental materials at a district-wide meeting of science teachers.

In November 2003, in response to plaintiff's questions, Lawrence clarified the procedure that was being executed. Specifically, defendant Lawrence stated that the science teachers were considering the materials proposed by plaintiff and

determining whether the materials would be used as part of the curriculum.  He further informed plaintiff that the Board directed this issue go through the biology teachers to their site-design teams and that these findings would be presented at the meetings in December 2003 or January 2004.

None of the above actions demonstrate that plaintiff had initiated an instructional materials challenge pursuant to Board Policy and Staff Rule 6521.  Rather, in September 2003, plaintiff complained about the available procedures to accomplish his goals of discussing instructional materials and implementing supplemental materials on a district-wide level.  As such, plaintiff asked for an *interim procedure*.  Plaintiff's request was granted, and he received a district-wide meeting of science teachers at the District's headquarters where he was allowed to have an expert give a presentation, present his proposed supplemental materials, make his own PowerPoint presentation, and answer questions of those in attendance.[25]  Plaintiff's materials were later sent to science professors at universities for review.[26]  None of these procedures are contemplated in Staff Rule 6521.  Moreover, Lawrence's clarification of the process that was being engaged in, via his November 2003 e-mail, further

---

[25]    At oral argument, the parties stated that this was done at the specific direction of the Board and that such a process was never employed before and has not been repeated.

[26]    Plaintiff also objects to statements made by certain professors in the context of these reviews.  These comments are irrelevant as none of these commentators are defendants in this suit, nor has plaintiff proffered any evidence regarding why these statements should be attributed to defendants.  While plaintiff implicitly argues that defendants purposely solicited the reviews from anti-Christian sources, plaintiff neither points to nor proffers any evidence in support of this argument.

clarified that this process was beyond the scope of a 6521 instructional materials challenge.

Plaintiff contends that his presentation to the science teachers on October 29, 2003 constituted the first level of review in the 6521 instructional materials challenge. As set forth above, the court finds that the undisputed evidence does not support plaintiff's contention. However, *assuming arguendo* that plaintiff's contention is correct, plaintiff failed to file a "Request for Reconsideration of Instructional Materials" form, a prerequisite for the latter stages of the review process. Plaintiff asserts that he was not informed of this requirement prior to April 9, 2004. (SDF ¶ 159). Plaintiff's own proffered evidence belies this assertion. Plaintiff's Exhibit 21 is an e-mail from defendant Lawrence to plaintiff, dated September 12, 2003. This e-mail sets forth, *inter alia*, the steps of a 6521 instructional materials challenge. The description of Step 2 is as follows:

> Step 2:   If the student, parent or community member does not feel that an adequate resolution has occurred they may contact the school principal and ask for the "Request for Reconsideration of Instructional Materials" form. Upon completion of the form and its submission to the site principal, the principal will review the contents and attempt to resolve the issue.

(Pl.'s Ex. 21 at 1 [Docket #108]). As such, plaintiff was on notice of the requisite action for appeal of an instructional materials challenge. Moreover, after the science teachers declined to use plaintiff's supplemental materials, plaintiff asked defendant Lawrence whether the District had a procedure for an appeal from or request for reconsideration of the decision.

Defendant Lawrence responded by referring plaintiff to his prior
e-mails regarding the process plaintiff was engaging in as well
as the processes for textbook selection, supplemental materials,
and instructional materials challenges.   There is no evidence
that plaintiff ever filed a "Request for Reconsideration of
Instructional Materials" form.[27]

In short, plaintiff contends that his due process rights
were violated because he was deprived of the District's levels of
review pursuant to Board Policy and Staff Rule 6521.   The
undisputed evidence demonstrates that plaintiff was not entitled
to review because he never initiated a 6521 challenge.   Rather,
because of plaintiff's expressed dissatisfaction with the
available procedures, defendants crafted a special procedure for
plaintiff whereby he was able to make a presentation at a
district-wide meeting of science teachers and have his materials
reviewed by university professors.   Moreover, even if plaintiff
mistakenly construed this process as the first step in a 6521
process, plaintiff failed to follow-up with a "Request for
Reconsideration of Instructional Materials" form as advised by
defendant Lawrence.   As such, because defendant was not entitled
to the second through fifth levels of review of the 6521 process,
plaintiff's claim for a violation of his procedural due process

///

///

///

---

[27]   This fact holds true even as to plaintiff's later
professed intention to meet with every teacher in the District in
order to initiate a 6521 Instructional Materials Challenge.   (See
DUF ¶ 120).

53

1  rights fails.[28]   Therefore, plaintiff's motion for summary

2  judgment regarding his claim for a procedural due process

3  violation arising out of defendants' conduct relating to an

4  instructional materials challenge is DENIED, and defendants'

5  motion for summary judgment is GRANTED.

6        **2.   School Board Meetings**

7        Plaintiff argues that defendants violated his right to

8  procedural due process because, in deciding what matters would be

9  placed on the agendas of school board meetings, they acted upon

10  unwritten policies designed to discriminate on this basis of

11  viewpoint.  (See FAC ¶ 28).  As set forth in the court's analysis

12  of plaintiff's claim that defendants violated his Free Speech

13  rights, the undisputed evidence demonstrates that plaintiff

14  failed to comply with the requirements of Board Bylaw 9365 until

15  April 2004.  The undisputed evidence also demonstrates that once

16  plaintiff complied with these requirements, his items were placed

17  on the school board agenda and ultimately voted upon.  Moreover,

18  plaintiff failed to proffer any evidence sufficient to raise a

19  triable issue of fact as to defendants' pretextual motives.  For

20  these reasons, plaintiff has failed to proffer evidence that

21  defendants acted upon unwritten policies to discriminate against

22  him in violation of his constitutional right to procedural due

23  process.  Therefore, plaintiff's motion for summary judgment

24  regarding his claim for a procedural due process violation

25  arising out of defendants' conduct relating to school board

26

27        [28]   To the extent plaintiff implicitly argues pretext, he
   has failed to point to or proffer evidence sufficient to raise a
28  triable issue of fact.

1  meetings is DENIED, and defendants' motion for summary judgment

2  is GRANTED.

3       **3.  Curriculum Instruction Team Meetings**

4       Similarly, plaintiff argues that defendants violated his

5  right to procedural due process because, in deciding what matters

6  would be discussed at CIT meetings, they acted upon unwritten

7  policies designed to discriminate on this basis of viewpoint.

8  (See FAC ¶ 37).  As set forth above in the court's analysis of

9  plaintiff's claim that defendants violated his Free Speech

10 rights, the undisputed evidence demonstrates that plaintiff never

11 requested that either a discussion of how GBHS taught evolution

12 or a discussion of his proposed QSE Policy and supplemental

13 materials be placed on the agenda of a CIT meeting in the fall of

14 2003.[29]  The undisputed evidence also demonstrates that the

15 reason for the removal of the Science Curriculum Update from the

16 agenda of the December 3, 2003 CIT Meeting was viewpoint neutral

17 and reasonable in light of the purposes served by the forum.

18 Finally, the undisputed evidence also demonstrates that after the

19 science teachers recommended that plaintiff's proposed

20 supplemental materials not be adopted, plaintiff never requested

21 that an item be placed on a CIT meeting agenda.  Moreover, as set

22 forth above, plaintiff has failed to present admissible evidence

23 of pretext sufficient to raise a genuine issue of material fact.

24 Therefore, plaintiff's motion for summary judgment regarding his

25

26      [29]    The parties presented evidence that plaintiff inquired
    whether the CIT meetings were a proper forum for his goals, but
27  that based upon his representations of those goals, defendant
    Severson informed him that it was not.  The CIT does not adopt
28  curriculum.

claim for a procedural due process violation arising out of

defendants' conduct relating to CIT meetings is DENIED, and

defendants' motion for summary judgment is GRANTED.

**C.   Plaintiff's Establishment Clause Rights**

Plaintiff asserts that defendants' restriction of his

participation in meetings, failure to give full review of his

QSEP, and failure to remedy violations of his constitutional

rights violate the Establishment Clause of the United States

Constitution.   The Establishment Clause provides: "Congress shall

make no law respecting an establishment of religion . . . ."

U.S. Const. amend. I, cl. 1.   The prohibition of the

Establishment Clause applies to state governments through the

Fourteenth Amendment.   Everson v. Board of Education, 330 U.S. 1,

8 (1947).   According to the Supreme Court,

> the Establishment Clause [has come] to mean that
> government may not promote or affiliate itself with any
> religious doctrine or organization, may not
> discriminate among persons on the basis of their
> religious beliefs and practices, may not delegate a
> governmental power to a religious institution, and may
> not involve itself too deeply in such an institution's
> affairs.

County of Allegheny v. ACLU, 492 U.S. 573, 590-91 (1989)

(footnotes omitted), quoted in Alvarado v. City of San Jose, 94

F.3d 1223, 1231 (9th Cir. 1996).

As decreed by the Supreme Court, and followed in the Ninth

Circuit,[30] claims brought under the Establishment Clause are

analyzed under the three-part "Lemon Test."   See Lemon v.

---

[30]   See Brown v. Woodland Jt. Unif. Sch. Dist., 27 F.3d
1373, 1378 (9th Cir. 1994); Kreisner v. San Diego, 1 F.3d 775,
780 (9th Cir. 1993).

Kurtzman, 403 U.S. 602 (1971).  Under the Lemon analysis, a

statute or practice which touches upon religion must (1) have a

secular purpose; (2) must neither advance nor inhibit religion in

its principal or primary effect; and (3) must not foster an

excessive entanglement with religion.  County of Allegheny, 492

U.S. at 592; see Lemon, 403 U.S. at 612-13.

### 1.  School Board Meetings

Plaintiff claims that defendants violated the Establishment

Clause when they excluded him from speaking or placing items on

the agenda of school board meetings because of their anti-

religious viewpoints.  Defendants contend that plaintiff was not

precluded from speaking at school board meetings and that any

restriction on plaintiff's placement of items on school board

agendas was based upon his failure to comply with the written

notice requirements of Board Bylaw 9365.

Plaintiff first contends that defendants impeded his access

to school board meetings with the purpose of disapproving of

plaintiff's Christian beliefs.  "In applying the purpose test, it

is appropriate to ask whether government's actual purpose is to

endorse or disapprove of religion." Wallace v. Jaffree, 472 U.S.

38, 56 (1985).  "However, a practice will stumble on the purpose

prong only if it is motivated *wholly* by an impermissible

purpose." Am. Family Ass'n, Inc. v. City and County of San

Francisco, 277 F.3d 1114, 1121 (9th Cir. 2002) (internal

quotations omitted).  "Moreover, a reviewing court must be

reluctant to attribute unconstitutional motives to government

actors in the face of a plausible secular purpose." Id.

(internal quotations omitted); see also McCreary County, Kentucky

1  <u>v. Am. Civil Liberties Union of Kentucky</u>, 545 U.S. 844, 865

2  (2005) ("[T]he Court often does accept governmental statements of

3  purpose, in keeping with the respect owed in the first instance

4  to such official claims.").

5      Again, as set forth above in the court's analysis of

6  plaintiff's Free Speech claim, the undisputed evidence

7  demonstrates that defendants failed to place plaintiff's proposed

8  QSE Policy on the agenda of school board meetings because of his

9  failure to comply with the requirements of Board Bylaw 9365.

10 Furthermore, plaintiff has failed to proffer evidence that

11 defendants' proffered reason was merely a pretext for

12 discrimination based on viewpoint or defendant's actual or

13 perceived religious beliefs.  <u>Cf.</u> <u>McCreary</u>, 545 U.S. at 865, 873-

14 74 (finding that the government's conduct presented the "unusual

15 case" where the proffered purpose was "an apparent sham" or "the

16 secular purpose secondary").  As such, defendants' conduct does

17 not run afoul of the secular purpose prong of the <u>Lemon</u> test.

18     Plaintiff then contends that defendants' conduct implicates

19 the second prong of the <u>Lemon</u> test because their conduct has the

20 primary effect of inhibiting religion.  In support of this

21 contention, plaintiff points to defendants' failure to place his

22 proposed QSE Policy on the agenda for thirteen different school

23 board meetings during the 2003-2004 school year.

24     The court's inquiry regarding what the primary effect of

25 government action is must be conducted "from the perspective of a

26 'reasonable observer' who is both informed and reasonable."  <u>Id.</u>

27 (quoting <u>Kreisner v. City of San Diego</u>, 1 F.3d 775, 784 (9th Cir.

28 1993).  In this case, the undisputed evidence reveals that

plaintiff did not comply with the written notice requirement of
Board Bylaw 9365 until April 2004.  When plaintiff did comply,
his proposed QSE Policy was placed on the agenda of a May 2004
Board Meeting and a June 2004 Board Meeting.  Based upon this
evidence, a reasonable observer would construe defendants'
conduct as requiring compliance with Board Bylaw 9365, not as
evidence of discrimination based upon religious viewpoints.

Plaintiff contends that defendants' alleged inflammatory
comments relating to his religion would cause a reasonable
observer to interpret defendants' conduct as primarily
disapproving of religion.  However, statements that may imply or
express hostility toward a religious view are not dispositive to
the primary effect analysis.  Am. Family Ass'n, 277 F.3d at 1122-
23.  In American Family Association, plaintiffs claimed that
defendants violated the Establishment Clause by (1) adopting a
resolution, which mentioned one of the plaintiff organizations by
name and contended, inter alia, that such organizations encourage
maltreatment of gays and lesbians through their message, and (2)
writing a letter to plaintiffs, which stated that violence
against homosexuals was in part due to plaintiff's message that
such individuals were not worthy of basic equal rights and
treatment.  Id. at 1119-20.  The Ninth Circuit noted that
defendants made statements from which it could be inferred that
defendants were hostile towards the religious view that
homosexuality is sinful or immoral, that defendants' writings may
have contained over-generalizations about the Religious Right,
that defendants at times misconstrued plaintiff's message, and
that defendant statements may have been based on a tenuous

perceived connection between the plaintiff's ads and violence
towards lesbians and gays.  Id. at 1122.  However, the court
found that these facts did not make religious hostility the
primary effect of defendants' conduct and that, when viewing the
allegations as a whole, the primary effect of defendants' conduct
was to promote equality for gays and discourage violence against
them.

Even assuming plaintiff's characterizations of defendants'
statements are true, such statements are insufficient for a trier
of fact to construe that disapproval of plaintiff's religious
beliefs was the primary focus or effect of not placing
plaintiff's item on the agenda.  Again the undisputed evidence
demonstrates that when plaintiff complied with Board Bylaw 9365,
his item was placed on a school board agenda in a timely fashion.
The undisputed evidence also demonstrates that even when
plaintiff's item was not on the agenda, he was allowed to speak
at length about his proposed QSE Policy and other related issues
during the "Audience to Visitors" portion of the meeting as well
as during related agenda items.  Therefore, a reasonable observer
would view the primary effect of defendants' conduct as enforcing
the reasonable, content-neutral requirements set forth in Board
Bylaw 9365.[31]

For these reasons, plaintiff's motion for summary judgment
regarding his claim for an Establishment Clause violation arising

---

[31]     Neither party addressed the third prong of the Lemon
test, whether the government's conduct fostered excessive
entanglement with religion.  Nor does this prong easily fit the
current case.  However, because plaintiff has failed to proffer
any argument or evidence of excessive entanglement with religion,
there is no genuine issue of triable fact on this issue.

1  out of defendants' conduct relating to school board meetings is

2  DENIED, and defendants' motion for summary judgment is GRANTED.

3          **2.  Curriculum Instruction Team Meetings**

4          Plaintiff also contends that defendants violated the

5  Establishment Clause because they did not act with a secular

6  purpose when they restricted his participation in CIT Meetings.

7  Again, as set forth above in the court's analysis of plaintiff's

8  Free Speech claim, the undisputed evidence demonstrates (1) that

9  defendant did not request that an item be place on the agenda of

10 a CIT meeting in the fall of 2003; (2) that the removal of the

11 Science Curriculum Update from the agenda of the December 3, 2003

12 CIT Meeting was viewpoint neutral and reasonable in light of the

13 purposes served by the forum; and (3) that after the

14 recommendation of the science teachers was rendered, plaintiff

15 did not request that an item be placed on the agenda of a

16 subsequent CIT meeting.  Plaintiff has also failed to proffer

17 admissible evidence that any of defendants' conduct relating to

18 CIT agenda items was motivated by religious animus.  As such,

19 plaintiff has failed to proffer evidence sufficient to

20 demonstrate that defendants' purpose was to disapprove of

21 religion.[32]  Therefore, plaintiff's motion for summary judgment

22 regarding his claim for an Establishment Clause violation arising

23 ///

24

25          [32]  Plaintiff proffers no evidence and little argument
   regarding the primary effect prong of the Lemon test.  Rather,
26 plaintiff generally states, without citation, that he "and
   likeminded parents were shut out from participating in the
27 process."  (Pl.'s Mot. for Summ. J. at 19).  Such conclusory
   assertions are insufficient to withstand a motion for summary
28 judgment.

1  out of defendants' conduct relating to CIT meetings is DENIED,

2  and defendants' motion for summary judgment is GRANTED.

3  **3.   Instructional Materials Challenge**

4  Plaintiff further contends that defendants violated the

5  Establishment Clause by failing to accord him four of the five

6  levels of review set forth in Staff Rule 6521.  Plaintiff asserts

7  that defendants' purpose in denying him these levels of review

8  was to disapprove of his religion.  As set forth in the court's

9  analysis of plaintiff's procedural due process claim, plaintiff

10  never invoked Board Policy and Staff Rule 6521, but rather

11  engaged in the special *interim procedure* that he requested and

12  defendants implemented.  Thus, defendants denied plaintiff these

13  levels of review because he was not entitled to them.

14  Plaintiff argues that "the anti-religious invectives by

15  professors which the District asked to review the science reform

16  materials were adopted by Defendants" and demonstrate that the

17  primary effect of defendants' conduct was to inhibit religion.

18  (Pl.'s Mot. for Summ. J. at 18-19).  Plaintiff has failed to cite

19  any evidence that the "anti-religious invectives" of outside

20  reviewers were adopted by the District.  However, assuming

21  *arguendo* that plaintiff's contentions are true, evidence of

22  statements that imply hostility toward a religious viewpoint are

23  not dispositive.  See Am. Family Ass'n, 277 F.3d at 1122-23.

24  Based upon the evidence submitted by the parties, a reasonable

25  observer would view the primary effect of defendants' conduct as

26  creating a special procedure at plaintiff's request in order to

27  ///

28  ///

62

accommodate his goals that fell outside the scope of a 6521 instructional materials challenge.[33]

Therefore, plaintiff's motion for summary judgment regarding his claim for an Establishment Clause violation arising out of defendants' conduct relating to an instructional materials challenge is DENIED, and defendants' motion for summary judgment is GRANTED.

**D.   Plaintiff's Equal Protection Rights**

Plaintiff further alleges a claim for relief against defendants under § 1983 for violations of the Equal Protection Clause.  (FAC ¶ 71).  The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amdt. 14, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)).  "The guarantee of equal protection is not a source of substantive rights or liberties, but rather a right to be free from discrimination in statutory classifications and other governmental activity." Williams, 367 F. Supp. 2d at 1270 (citing Harris v. McRae, 448 U.S. 297, 322 (1980)). "[D]iscrimination cannot exist in a vacuum; it can only be found in the unequal treatment of people in similar circumstances." Id. (quoting Attorney General v. Irish People, Inc., 684 F.2d 928, 946 (D.C. Cir. 1982)).

---

[33]     Again, the parties fail to proffer any evidence or argument relating to the third prong of the Lemon test.

1   Plaintiff has failed to proffer any evidence that he was
2   treated differently than other similarly situated individuals.
3   For example, plaintiff neither argues nor produces evidence that
4   other individuals who did not comply with the written notice
5   requirement of Board Bylaw 9365 had their items placed on the
6   agenda of school board meetings.  Nor does plaintiff argue or
7   produce evidence that other parents with different views on the
8   issue of evolution were allowed to speak at CIT meetings while he
9   was not.  Nor does plaintiff argue or produce evidence that other
10  parents who received an interim procedure also received the
11  levels of review set forth in Staff Rule 6521.[34]  Rather,
12  plaintiff merely repeats his same conclusory arguments that he
13  was discriminated against on the basis of his religion.  As set
14  forth above, the court has found that plaintiff has failed to
15  proffer evidence sufficient to demonstrate a triable issue of
16  fact as to any of his constitutional claims based upon this
17  alleged discrimination.  Therefore, plaintiff's motion for
18  summary judgment regarding his claim for an Equal Protection
19  Clause violation arising out of defendants' conduct is DENIED,
20  and defendants' motion for summary judgment is GRANTED.
21  /////
22  /////
23  /////
24  /////

25  _____

26  [34]   The court does not hold that these are the only means
    by which plaintiff could set forth a triable issue of fact as to
27  an Equal Protection violation.  The court merely highlights that
    plaintiff has failed to argue or produce evidence that
28  demonstrate with any level of specificity that defendants
    subjected him to unequal treatment.

**E.   Injunctive Relief**[35]

Finally, plaintiff argues that even if defendants have not violated any of his constitutional rights, he still has standing to sue for injunctive relief based upon his contention that defendant Monetti has unwritten discretionary rules of deciding what citizen agenda items to include on school board meeting agendas.  Plaintiff has not proffered sufficient evidence of the existence of this alleged unwritten policy.

Plaintiff relies on the Ninth Circuit's decision in <u>Santa Monica Food Not Bombs v. City of Santa Monica</u>, 450 F.3d 1022, 1034 (9th Cir. 2006).  However, in <u>Santa Monica</u>, the plaintiffs challenged various sections of the Community Events Ordinance of the city.  As such, there was no dispute that such policies existed.  In this case, plaintiff challenges unwritten rules allegedly implemented and executed by defendant Monetti in his decision-making process.  Plaintiff fails to cite any evidence in support of his contention that such a policy exists.  (<u>See</u> Pl.'s Supp. Reply, filed June 22, 2007, at 4).  However, based upon the arguments raised in other sections of plaintiff's prior briefing, the court construes that plaintiff would cite to both his characterizations of prior statements by defendant Monetti as well as defendant Monetti's past conduct.  A review of the

_____

[35]   In their moving papers, defendants argued that the threat of prospective harm as to defendants Genasci, Lawrence, and Joiner is moot because they no longer hold office.  Plaintiff contends that the case is not moot because Federal Rule of Civil Procedure 25 provides for the substitution of official parties. Because, as set forth above, the court has found that plaintiff has failed to proffer evidence sufficient to demonstrate a triable issue of fact as to any of his claims, the court does not address the merits of this issue.

1  evidence submitted by the parties demonstrates that there is
2  insufficient evidence to raise a triable issue of fact that
3  defendant Monetti had a policy of leaving citizen proposals off
4  school board agendas when the requirements of Board Bylaw 9365
5  were fulfilled and the matter was within the subject matter
6  jurisdiction of the school board.  Further, there is insufficient
7  evidence that defendant Monetti ever acted in accordance with
8  such a policy.[36]  As such, plaintiff's motion for summary
9  judgment regarding his claim for injunctive relief is DENIED, and
10 defendant's motion for summary judgment is GRANTED.

**CONCLUSION**

12     For the foregoing reasons, plaintiff's motion for summary
13 judgment is DENIED, and defendants' motion for summary judgment
14 is GRANTED.  The Clerk of the Court is directed to close this
15 file.

16     IT IS SO ORDERED.

17 DATED: September 7, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

     [36]  Moreover, the undisputed evidence reveals that, aside
from the allegations in the complaints in this litigation,
plaintiff has not sought to place the his QSE Policy on any board
meeting agendas. (SDF ¶ 137)